578 F.2d 735
 UNITED STATES of America, Appellee,
v.
Robert WALLACE, Appellant.
UNITED STATES of America, Appellee,
v.
Don MITCHELL, Appellant.
UNITED STATES of America, Appellee,
v.
Gerald DIXON, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas FORTENBERRY, Appellant.
 Nos. 77-1558, 77-1526, 77-1567 and 77-1698.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 15, 1978.
Decided June 13, 1978.
Rehearing and Rehearing En Banc Denied in No. 77-1526 July 6, 1978.
Rehearing and Rehearing En Banc Denied in Nos. 77-1588,
77-1567 and 77-1698
July 17, 1978.
 
 John F. Forster, Jr., Little Rock, Ark., for appellants Mitchell, Dixon and Fortenberry; Ronald J. Waska, Houston, Tex., for appellant Wallace; Fred T. Bennett, Houston, Tex., and Donald H. Smith, Pine Bluff, Ark., on the brief.
 Wilbur H. Dillahunty, U. S. Atty., and Don N. Curdie, Asst. U. S. Atty., Little Rock, Ark., for appellee.
 Before GIBSON, Chief Judge, STEPHENSON, Circuit Judge, and BECKER, Senior District Judge.*
 GIBSON, Chief Judge.
 
 
 1
 This case involves an unsuccessful scheme for the sale of approximately 205 pounds of marijuana, which culminated in the criminal convictions under both Arkansas and federal law of Robert Wallace, Don Mitchell, Gerald Dixon and Thomas Fortenberry. All four defendants appeal their federal convictions.
 
 
 2
 On January 14, 1976, Trooper Jerry Roberts of the Arkansas State Police discussed a possible purchase of marijuana with several of the defendants at Dixon's Exxon Service Station in Sheridan, Arkansas. During the first discussion on that date, Mitchell and Dixon, CB aficionados who generally identified themselves to Roberts by their "handles," "Fiddlefoot" and "Snake," explained their drug business and expressed an unwillingness to handle small quantities of drugs. They stated that it was their preference and usual habit to deal in marijuana in minimum lots of 300 pounds. Roberts indicated that he would be interested in buying 300 pounds of marijuana at $150 per pound. Later that day, Mitchell and Dixon introduced Roberts to their "money man," Thomas Fortenberry, who discussed the payment and delivery details of the proposed sale with Roberts. When Roberts objected to certain aspects of the plan offered by defendants, Fortenberry suggested that Roberts secure the purchase money of $45,000 in a safe deposit box or bank account. On the following day, Roberts explained his position to officials at the National Bank of Commerce in Pine Bluff, Arkansas, and asked for their help in setting up a dummy account for $45,000. With their cooperation, he obtained a checking account number and two signature cards for a joint checking account. Fortenberry subsequently signed the signature cards in Roberts's presence at the bank.
 
 
 3
 Satisfied with the arrangement, defendants told Roberts to expect delivery of his 300 pounds of marijuana within the near future. For a variety of reasons which are not germane to this appeal, the marijuana did not arrive in the near future. Roberts kept in close contact with defendants by telephone until March 29, 1976, when a shipment of approximately 200 pounds of marijuana finally reached Sheridan, Arkansas. It was delivered to Roberts at Dixon's Exxon Service Station by defendants Wallace and Crisp, who were introduced to Roberts by Fortenberry as "our people from Texas (who) are here with the stuff." Wallace and Crisp had driven from Texas to Arkansas in a wrecker, towing a Lincoln Continental containing 205 pounds of marijuana. All defendants except Mitchell were present when the delivery was made to Roberts at Dixon's Exxon Station. Fortenberry explained Mitchell's absence by saying that Mitchell was in Texas working on another deal. Fortenberry and Roberts discussed doing regular business in the future at the rate of two 300-pound shipments of marijuana per week. Wallace, Fortenberry, Dixon and Crisp were then placed under arrest by Arkansas State Police. Mitchell was arrested later.
 
 
 4
 Mitchell, Wallace, Fortenberry, Dixon and Crisp were all charged by way of felony information in Grant County, Arkansas, with possessing approximately 205 pounds of marijuana in violation of Ark.Stat.Ann. § 82-2617 (1976). Their trial was set to commence on November 18, 1976, before Henry Means, Circuit Judge of the Seventh Judicial District of Arkansas. On the evening of November 17, 1976, Judge Means telephoned John Cole, the prosecuting attorney for Grant County, and informed him that he had conferred with defense counsel and had decided that Mitchell, Wallace, Fortenberry and Dixon, all of whom were willing to plead guilty, deserved probation and $1000 fines. Crisp, who was refusing to plead guilty, would go to trial. Cole objected unsuccessfully to the ex parte manner in which the case was being handled. Judge Means placed a second telephone call to Cole later the same evening. During this later conversation, a conference call in which the attorney representing Crisp and Wallace participated, Judge Means informed Cole of some changes in the proposed pleas and punishments. Means told Cole that he had decided to increase Wallace's fine from $1000 to $2000 "in order to justify it" and to dismiss Crisp's case, since Crisp had not been deeply involved in the case and was already on federal probation in Texas for possession of marijuana. In response to Cole's objections, the judge simply replied: "You can object all you want to tomorrow on the record."
 
 
 5
 Cole did object on the record on the following day when Judge Means dismissed the case against Crisp and allowed the other four defendants to plead guilty. Cole was held in contempt of court for his strong objections to Judge Means's disposition of the case.[1] Mitchell, Dixon and Fortenberry were placed on probation for five years and fined $1000 each; Wallace was placed on probation for five years and fined $2000. On this same day, November 18, 1976, Cole also spoke to W. H. Dillahunty, the United States Attorney in Little Rock, Arkansas, about Judge Means's disposition of the case. Cole believed that Means's handling of the case had violated Rule 25.3(a) of the Arkansas Rules of Criminal Procedure, which forbids a judge from participating in plea discussions. Cole asked Dillahunty to take the case and determine whether there was federal involvement. Dillahunty agreed to have his office look into it, but cautioned Cole that because of the Department of Justice policy against dual prosecutions, he would be unable to proceed formally with the case without approval from the Department of Justice. The matter was then submitted to the Department of Justice. On December 20, 1976, Dillahunty received a letter from the Department of Justice advising him that the Attorney General of the United States had waived the application of the Petite policy against dual prosecution and had authorized indictments against all five defendants. Dillahunty submitted the case to a federal grand jury, and a three-count indictment was handed down on January 21, 1977. Count I charged all five defendants with violating 21 U.S.C. § 846 by conspiring to violate 21 U.S.C. § 841(a) "by possessing with intent to distribute and by distributing marijuana * * * ." Count II charged Wallace, Dixon, Fortenberry and Crisp with possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a). Count III charged Mitchell with aiding and abetting the other four defendants in their possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2.
 
 
 6
 Defendants Wallace and Crisp successfully moved for severance. Motions by all defendants for change of venue were also granted. Dixon, Fortenberry and Mitchell were tried jointly to a jury in Memphis, Tennessee, in March 1977. All three were convicted as charged. Dixon and Mitchell were each sentenced to two concurrent 20-month terms of imprisonment, to be followed by two-year special parole terms. Fortenberry was sentenced to 22 months imprisonment, to be followed by a two-year special parole term. In a separate jury trial held in Memphis in May 1977, Wallace was also convicted on all counts. He was sentenced to two concurrent three-year terms of imprisonment and a special parole term of two years. At yet another trial in Memphis, Crisp was acquitted.[2] Wallace, Mitchell, Dixon and Fortenberry appeal.
 
 
 7
 All defendants challenge the validity of their federal convictions on the basis that the United States undertook their prosecution in violation of the Department of Justice policy against dual prosecution. For the reasons set forth below, we find this contention to be lacking in both factual and legal support.
 
 
 8
 The concept of "dual sovereignty," which inheres in our federal system, recognizes that state and federal governments have legitimate, although not necessarily identical, interests in the prosecution of a person for acts made criminal under the laws of both. Rinaldi v. United States, 434 U.S. 22, 98 S.Ct. 81, 84, 54 L.Ed.2d 207 (1977). Under this concept, the problem of double jeopardy is avoided, because one act may constitute separate and distinct offenses against both state and federal governments. Turley v. Wyrick, 554 F.2d 840, 841 (8th Cir. 1977), cert. denied, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978). Thus, successive federal-state prosecutions do not run afoul of the due process clause of the fourteenth amendment, Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), and successive state-federal prosecutions are not barred by the double jeopardy clause of the fifth amendment. Rinaldi v. United States, supra; Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959).
 
 
 9
 Although dual federal and state prosecutions are not prohibited by our Constitution, the Supreme Court has nonetheless expressed repeated concern over the unfairness and potential for abuse associated with successive prosecutions based on the same conduct. See Rinaldi v. United States, supra 98 S.Ct. at 84; United States v. Lanza, 260 U.S. 377, 383, 43 S.Ct. 141, 67 L.Ed. 314 (1922); Fox v. Ohio, 46 U.S. (5 How.) 410, 434, 12 L.Ed. 213 (1847). In response to the Supreme Court's expressions of concern over the problems engendered by multiple prosecutions, the Department of Justice adopted a policy in 1959, generally known as the Petite policy,[3] under which it declines to bring a federal prosecution after a state prosecution unless the reasons for the successive federal prosecution are compelling. Pursuant to this policy, it is the usual practice for a United States Attorney to obtain approval from the Attorney General prior to undertaking the prosecution of an individual for conduct which has already been the subject of a state prosecution.
 
 
 10
 The record before us indicates that the United States Attorney sought and obtained the approval of the Attorney General before submitting this case to a grand jury and obtaining the indictments which underlie the convictions now being appealed. Thus, there can be no question of noncompliance with the Petite policy.[4] Despite the clear compliance of the United States Attorney with the Petite policy, defendants contended to the trial court and now argue on appeal that the Attorney General's approval was invalid because it was not based on "compelling reasons." They also urge that the trial court erred in refusing to examine the reasons behind the Government's waiver of the Petite policy.
 
 
 11
 We must sustain the trial court's refusal to look behind the Petite waiver and we must reject the defendants' speculative denigration of the Government's grounds for this waiver for the same reason. The decision to waive the Petite policy involves an exercise of prosecutorial discretion which is an improper subject for judicial evaluation. Watts v. United States, 422 U.S. 1032, 1036-37, 95 S.Ct. 2648, 45 L.Ed.2d 688 (1975) (Burger, C. J., dissenting); United States v. Hayles, 492 F.2d 125, 126 (5th Cir. 1974); United States v. Frumento, 409 F.Supp. 136, 141 (E.D.Pa.1976), aff'd, 563 F.2d 1083 (3d Cir. 1977). We decline, as did the trial court, the invitation to become embroiled in a discretionary matter which, under our system of government, has been clearly entrusted to the executive branch. We will not look behind the Government's reasons for waiving the Petite policy.[5]
 
 
 12
 Defendant Wallace also contends that the indictment against him was based upon unconstitutional selective prosecution and that the trial court erred in refusing to dismiss the indictment on this basis. We agree with the trial court that Wallace failed to make a prima facie showing of selective prosecution.
 
 
 13
 The defendant bears the burden of establishing prima facie the fact of selective prosecution, since "(t)he presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice." United States v. Falk, 479 F.2d 616, 620 (7th Cir. 1973) (en banc), quoted in United States v. Crow Dog, 532 F.2d 1182, 1196 (8th Cir. 1976), cert. denied, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977). In United States v. Swanson, 509 F.2d 1205, 1208-09 (8th Cir. 1975), this circuit approved the two-pronged test of "intentional and purposeful discrimination" espoused by the Second Circuit in United States v. Berrios, 501 F.2d 1207 (2d Cir. 1974).
 
 
 14
 To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as "intentional and purposeful discrimination." * * * Mere "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." (Citations omitted.)
 
 
 15
 United States v. Berrios, supra at 1211. We need not address the question of whether Wallace has made a prima facie showing under the first prong of this test, for we find that he failed to establish, as required by the second prong, that his prosecution was based upon any impermissible consideration such as race, religion or the desire to prevent his exercise of a constitutional right. In view of defendant's utter failure to show that his prosecution was purposefully discriminatory, the trial court's refusal to dismiss his indictment on the basis of selective prosecution was entirely correct.
 
 
 16
 Defendants also assail their convictions on the basis that each of the three counts of the indictment is defective. Defendant Wallace challenges the sufficiency of Count I, which charged a conspiracy to violate 21 U.S.C. § 841(a), in violation of 21 U.S.C. § 846. The gist of Wallace's position is that knowledge is an essential element of a substantive violation under 21 U.S.C. § 841(a); Count I, which charges a conspiracy to violate § 841(a), fails to charge knowledge; therefore, Count I fails to set forth an essential element of the offense charged.
 
 
 17
 We agree both with the trial judge's observation that the draftsmanship of Count I "may leave something to be desired" and with his conclusion that it nevertheless makes a sufficient allegation to serve as fair notice to defendant. Count I charges a conspiracy; it contains proper references to 21 U.S.C. § 841(a), the substantive statute which defendants are charged with conspiring to violate, and to 21 U.S.C. § 846, the statute under which this alleged conspiracy is illegal. Thus, defendant was on clear notice that he was charged with a conspiracy, illegal under 21 U.S.C. § 846, to violate 21 U.S.C. § 841(a). Under these circumstances, there can be no doubt that defendant was fairly apprised of the nature of the conspiracy with which he was charged, and we must reject defendant's somewhat disingenuous suggestion that he was misled by this count.[6]
 
 
 18
 Defendants Mitchell, Dixon and Fortenberry attack the sufficiency of Counts II and III. Count II charges Dixon and Fortenberry with a substantive violation of 21 U.S.C. § 841(a). Count III charges Mitchell with aiding and abetting his co-defendants in violating 21 U.S.C. § 841(a). Both counts track the language of the statute. These counts are clearly sufficient; indeed, it is hard to imagine how they could have been framed to give defendants clearer notice of the offenses with which they were charged.
 
 
 19
 Defendants Mitchell, Dixon and Fortenberry also contend that the trial court erred in failing to grant their motion for new trial or acquittal based on newly discovered evidence. The motion alleged that, contrary to the trial testimony of Trooper Jerry Roberts to the effect that no tape recordings of defendants had been made, there had been some use by state police of electronic surveillance devices. Apparently, some of the Arkansas police involved in the case attempted to use tape recording devices; their efforts failed and no audible tapes were ever produced; and Roberts was unaware of these attempts.
 
 
 20
 In this circuit, the relevant standards for granting a motion for new trial on the ground of newly discovered evidence are as follows:
 
 
 21
 (1) the evidence must be in fact newly discovered, that is, discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved, and (5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal.
 
 
 22
 United States v. Pope, 415 F.2d 685, 691 (8th Cir.), cert. denied, 397 U.S. 950, 90 S.Ct. 973, 25 L.Ed.2d 132 (1969). We need not judge the newly discovered evidence adduced here in light of each of these standards, for it is clear that it was not of such nature that it would probably produce an acquittal at a new trial. The grant or denial of a motion for new trial based on newly discovered evidence is within the broad discretion of the trial court, and the trial court's decision will not be reversed absent a clear abuse of discretion. United States v. Bohn, 508 F.2d 1145, 1150 (8th Cir.), cert. denied, 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100 (1975). There was no abuse of discretion in the trial court's denial of defendants' motion for new trial.
 
 
 23
 Finally, defendants Mitchell, Fortenberry and Dixon challenge the sufficiency of the evidence supporting the jury's verdicts of guilty. We have already set forth a mere portion of the salient evidence of defendants' involvement in an operation devoted to the distribution of drugs in large quantities. We do not consider it necessary to repeat or augment our previous evidentiary recitation. Suffice it to say that we have carefully reviewed the record and are convinced that it contains overwhelming evidence supportive of the jury's verdicts.
 
 
 24
 Affirmed.
 
 
 
 *
 The Honorable William H. Becker, Senior United States District Judge, Western District of Missouri, sitting by designation
 
 
 [1]
 A fine of $50 was assessed against Cole
 
 
 [2]
 The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas, presided at all three trials
 
 
 [3]
 William P. Rogers announced the policy in 1959 by means of a press release accompanied by a memorandum to United States attorneys. For the text of the press release and memorandum, see United States v. Mechanic, 454 F.2d 849, 855 n. 5 (8th Cir. 1971). The policy derives its name from the case in which its existence was first acknowledged by the Supreme Court, Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960)
 
 
 [4]
 It is noteworthy, moreover, that where a successive federal conviction has been obtained without the prior approval of the Attorney General, courts have generally been unwilling to consider this noncompliance with a "housekeeping" provision of the Department of Justice to be a basis for invalidating the federal conviction. See United States v. Hutul, 416 F.2d 607, 626 (7th Cir. 1969), cert. denied, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970); Haley v. United States, 394 F.Supp. 1022 (W.D.Mo.1975); cf. United States v. Mechanic, 454 F.2d 849, 855-56 (8th Cir. 1971); United States v. Synnes, 438 F.2d 764, 773 n. 11 (8th Cir. 1971)
 
 
 [5]
 We cannot help noting, nevertheless, that defendants' attempts to characterize the record here as devoid of compelling reasons for federal prosecution are feeble. Compelling reasons for a federal prosecution leap from the record. Furthermore, the prosecution here presents no deviation from the considerations of fairness underlying the Petite policy. The instant federal prosecution did not duplicate a meaningful state prosecution; it simply filled the void left by a breakdown in the operation of the state's system of criminal justice
 
 
 [6]
 We note, moreover, that the charge of conspiracy to violate a criminal law has implicit in it the elements of knowledge and intent. Frohwerk v. United States, 249 U.S. 204, 209, 39 S.Ct. 249, 63 L.Ed. 561 (1919); Schnautz v. United States, 263 F.2d 525, 529 (5th Cir. 1959)